We will hear first from Mr. Flynn. Thank you, Your Honor. May it please the Court. James Flynn for the children of Erie Moore, Tamara Green, Tiffany Robinson, and Erie Moore, Jr. There will be a trial in this case, and a jury will be asked to determine whether the uses of force against Mr. Moore violated his constitutional rights. This is an extraordinary case, given the extent of that force captured on video but omitted from the Guard's reports of the incident. It's also an extraordinary case given the District Court's factual determinations at summary judgment, which will prevent the jury from holding anyone liable for Mr. Moore's death, and from holding LaSalle, Richwood, and the City of Monroe liable for his injuries at all. I propose to focus today on two critical issues underlying the summary judgment orders. First, the District Court's grant of summary judgment of the cause of Mr. Moore's death, and second, the District Court's ruling that Section 1983. On causation, the District Court drew entrances and defendants' favor on two key disputed issues. First, the District Court decided that a reasonable jury would be required, as a matter of law, to conclude that Mr. Moore's fatal brain bleed could have formed as early as 48 hours before his admission to the hospital on the night of October 13th. This, despite testimony from a treating physician, that the brain bleed was, quote, more likely than not, inflicted within five hours of his arrival at the hospital. That was not, as defendants contend, perfectly equivocal evidence. Second, the District Court found that a reasonable jury would be required to conclude that purely speculative injuries, purportedly inflicted before the guard's uses of force, were reasonably probable causes of Mr. Moore's death. But without any competent evidence of those injuries, a reasonable jury could find that they were non-existent, or at the very least, merely possible but not probable causes of his death. On that initial matter of the timing, the treating physicians testified that the trauma occurred within five hours of admission at 9.35 p.m. to the local hospital. That's 24.186, Dr. Nelson. And it would, quote, be my opinion that the trauma affected Mr. Moore more likely than not happened within five hours of presentation. That's 24.185. Another treating physician, Dr. Owings, agreed. He testified that the hematoma, quote, was not present, end quote, during the 7 p.m. video. That's 24.583, Dr. Owings. Is your, is the argument of error here as to causation that each, each runner, Campbell, each blow that's on the video and then Foster's description of the, of whatever happened in the four-way corridors, was a substantial factor causing the death? Or are you primarily arguing sort of this, this coordinated unit theory? We think a jury could accept both theories, Your Honor. We start with that, that theory that each of them was a substantial factor in his death. But we also think that a jury could reasonably conclude that the defendants were functioning as a unit. That's under this court's decision in Simpson v. Hines in 1990. And you've seen how they, they, they urge us to distinguish Simpson v. Hines. What, what are your thoughts about? I do. I think a jury could conclude that the evidence here supports functioning as a unit under Simpson. For example, defendant Hardwell, one of the guards involved, testified that, quote, we had a plan. That's 13155 in the record. So they were functioning, they concede they were functioning as a unit. We have video evidence of all four. We have a video evidence of Runner giving him the blow that drops him to the floor. And then we have video evidence of Hardwell body slamming him out of the cell. And then the third one though, would you agree? I mean, disagree, or, but if you would, under Scott v. Harris, the third one looks pretty darn accidental. So, Your Honor, I think it is at the very least reckless under Scott v. Harris. And that's because the defendants concede that there was a stretcher and a wheelchair available. And nonetheless, they decided to essentially lug Mr. Moore's body down the hallway to the four-way. So even if the court is unpersuaded that the drop was intentional, we think at the very least it was a constitutional violation of recklessness, given the opportunities they had to transport him safely and knowing the injuries they had just inflicted to his head. So those are the three years, three first uses of force. And as Your Honor indicated, there was the fourth, and that's the use of force in the four-way that defendant Badger, or excuse me, defendant Foster described as beating Mr. Moore to death. So we think all four of those. Any argument as to that depends on Foster's testimony being admissible. And your theory is it's a party-opponent admission? It does not depend exclusively on Foster's testimony being admissible. There's also evidence that injuries were inflicted in the four-way based on defendant Mitchell, the nurse's observations that injuries arose after he first saw Mr. Moore. But as to Foster's description of this is where they finished him off? Yes. So as to Foster's description, it's a party admission. It is an admission of an agent as to the corporate defendants, an employee, a co-conspirator as to the other members of the group who had a plan and attacked Mr. Moore. And I'd also note that the defendants didn't raise hearsay below, and that this Court has said that it's not error for the District Court to consider a statement that isn't objected to at summary judgment. Unless this Court has other questions on causation, I'll move to respond to Yes, Your Honor. Are you going to touch on deliberate indifference, or do you see there having made a concession that we don't need to get into that? So, Your Honor, this Court has explained that when the appellee fails to brief or develop an argument on appeal, that that argument is not a basis for affirming the judgment below, and so we think that they have waived his deliberate indifference. I'm happy to answer questions if Your Honors have them. I guess, what's your authority, if you do have a nurse practitioner, someone like Mitchell, that does do a sternum rub and assesses the individual, under what theory would the guard still be deliberately indifferent? Wouldn't they have assumed the nurse is going to take care of him? So, Your Honor, this Court... In Dyer? Sorry. In Dyer and in Koch, sorry, in Boccecova, has described that delay in treatment can also be actionable, and we think that the guards covering up of the injuries to Mr. Moore, they didn't report those injuries to Defendant Mitchell, so Defendant Mitchell had no idea that there had been these severe traumas to Mr. Moore's head. So we think that was interference with medical assistance. That was reckless of them. So it's not... The fact that the nurse visited him along the way doesn't cleanse their failures and their omissions and lies in the reports. I do have a question about causation. Yes. Before you move on. So your leading argument seems to be that the defendants individually caused Moore's death, but do you need to win on that issue? I mean, what happens in your case if we agree with you there's a fact dispute on your concurrent causation theories? That's right, Your Honor. So you could agree with us on any of these theories. We think a jury could accept any of these theories. Does that answer your question? Yeah, I just didn't know if you conceded that you kind of rise or fall on your individual causation alone. No, we wouldn't. Okay. Yeah, we think these are two independent avenues to liability. Okay. On respondeat superior as to the corporate defendants, our opening brief presented a comprehensive analysis of the statutory text, the common law, the legislative history, and Supreme Court precedent. Defendants have no response on these issues. Instead, they rely on a meritless preservation argument and non-precedential decisions that merely assume the point in their favor. They don't want this court to look at the text in the history because on resolving this is the text of section 1983, which the Supreme Court has explained incorporates common law principles, quote, absent specific provisions to the contrary. Here there are immunities that apply to municipalities because there were immunities that apply to municipalities at common law. There are no immunities that apply to the private corporations because no such immunities existed at common law and defendants have pointed to none. The really the only maybe very compelling analysis of this that's been given in your favor is that Seventh Circuit Shields' decision. That's right, Your Honor. Am I correct that no circuit's adopted it even? That's right. Most circuits have assumed that Monell applies and have not gone back to do this. And we're still open, though. We are. It is an open question of the Fifth Circuit. But we would be creating a split with those others that have assumed it in published opinions. That's right, Your Honor. And you're urging us to do that. I am. I think that the failure of other circuits to analyze the text in the history is no reason for this Court not to reach the issue and to do its own analysis. And at bottom, the outcome here for private corporations and municipalities is different because the common law was different for private corporations and municipalities. Defendants argue that because they were performing a public function, that should change the analysis, but this Court has rejected that very argument, has explained that it's the identity of the entity and not the function they're performing that matters. How do you pronounce the most recent Supreme Court case? Is it a Dix? I don't know, Your Honor. You don't know? No, I'm sorry. But how much of the contrary law predated a Dix? Is that part of your argument? Yes. So much of the contrary law predated a Dix. A DK is a Dix, if you will. And yet that decision says a private employee of a private institution responding at Superior can apply. In that case, it was a restaurant. It was a matter of segregation that was going on. That was 1970. And even if this Court reaches the policy rationales given by the District Court below and argued by the defendants here, we think the concerns expressed in Monel do not apply to private corporations. The Supreme Court explained that in the city of Oklahoma City versus Tuttle, that municipal tort immunities existed at common law. In Monel itself, they explained that there were federalism concerns, the relationship between the federal government and local governments that affected their decision. There was the legislative history of the Sherman Amendment that regarded municipalities that would not apply to private corporations. And in Richardson v. McKnight, the Supreme Court in 1997 again stated that no such immunities existed for contractors. Briefly, because I expect the other side to mention preservation on this issue, that this issue was raised below. The District Court ruled on it below. That's 27295. The District Court held that, quote, LaSalle and Richwood may not be held liable for the acts of employees under a theory of respondeat superior. And in fact, the defendants were offered substantial opportunities to brief this issue, both in a protective order and the motion to compel. And then again, at summary judgment, there were three opportunities for them to do so. I'd point your honors to the record at 2145, where the defendants argue, quote, the plaintiffs suggest and argue that LaSalle may or should be held vicariously liable for the actions of his employees. So this issue was raised. It was briefed. It was preserved. The fact that the District Court ruled on it at all under this Court's decision in Vavra v. Kellogg Brown is enough to preserve it. You can make similarly quick work of the argument that we didn't preserve it in the complaint. We did make allegations about the defendants acting within the scope of their employment. That's at 1379 to 1383. And that is sufficient under the Supreme Court's decision in Johnson v. Shelby. Briefly, lastly, your honors, on the city of Monroe, the District Court granted summary judgment in favor of the city, essentially because it was granting summary judgment in favor of the other defendants. It held that the claims against the city rose or fell with the claims against the other defendants. For much the same reason, we think summary judgment should be reversed as to the city. They point to a case of Bennett. They say in their favor. We think that that case clearly explains that the actions of the defendants here fell within the scope of the policymaking delegation for policies related to the use of force. Obviously, these were uses of force. Unless there are other questions, your honor, I reserve the balance of my time. Thank you. Thank you, counsel. Mr. Frosch? 11-7. Please accord, Craig Frosch, on behalf of the sheriff defendants. We're going to be real quick. I think the summary judgment was granted in favor of the sheriff defendants, and no issues as to that judgment were briefed, identified by the appellants here, so we submit, your honors, that the claims or the appeal as to the sheriff defendants has been waived or abandoned, and the judgment below should not be disturbed and or it should be affirmed by this court. Unless there are any questions, I'll yield the rest of my time to Mr. Calvin. Thank you, counsel. Thank you. Mr. Calvin? If I may, your honor, I'd like to go ahead and make one clarification before I get into the merits. There was some confusion in reading the brief of the plaintiffs relative to the claims that are remaining and the parties that are remaining. Based upon the comments and my review of the brief, it appears that the claims made against Altman, Hanson, Brown, Hart, Walker, and Alton Hale are all gone. They weren't briefed. It looks like the live claims are involving Runner, Hardwell, Williams, Curley, Nurse Mitchell, LaSalle, and Richwood. Punitive damages were only preserved as a claim relative to the claim for LaSalle and Richwood, and then the claims for Runner, Hardwell, Williams, and Curley. Mitchell, they did not brief or perfect any kind of argument related to Mitchell's punitive damage claim or the claim against Mr. Mitchell that was dismissed by the court. The first thing I'd like to talk about on the merits is the respondeat superior argument. Initially, our briefing indicated that they had waived that argument. Our position is based upon the pleadings, the arguments that were made on the liability issues. For example, the plaintiffs filed their own motion for partial summary judgment and did not raise in that any argument about respondeat superior or vicarious liability. In response to our MSJ, the plaintiffs filed an opposition to the MSJ, didn't raise the issue either. They also filed a reply to our opposition to their memo, and nothing was raised relative to those issues. I think we'll figure out the waiver issue. We appreciate the arguments in the briefs, too, but if you could just address Shields, because it was in their brief and it wasn't addressed by you. So if we do reach the merits, what's your answer to the logic in the 7th Circuit? On respondeat superior? Well, specifically the 7th Circuit's Shields decision. It is a one-off. There's nothing in the 5th Circuit land that lends Shields the effect that they seek in the 5th Circuit. If I may, going back to the progress in the 5th Circuit of 1983 law, and we all know that Monel came first, then Harlow v. Fitzgerald, then City of Newport, then Smith, then City of Canton, and then Richardson. All of those cases were extant on our books, so to speak. Then Rossborough was decided and pulled all of that in as a 1983 law. Their argument is that Rossborough didn't speak about Monel and the effects of the different decisions, but it also didn't speak about all the other issues that were maintained or within 1983. So right now, there is no impetus, in my view of course, to separate us from what we've been doing for all these years. Certainly on Monel— But I guess their position is start with the text of 1983. Right. Look at what Congress would have intended back in 1871. Sure. A private corporation would have been responsible for torts of its employees as long as they were within the scope of their employment. So if we find there is causation, what's the logic that they should get this solicitude that we give to municipalities? Well, if you look at the overall—I understand what Spears says, and I understand the functional argument that was discussed and has been on a lot of these courts' decisions. But the way I look at it is you have definitive proof on how you have to do a corporation analysis. In other words, a municipality analysis. And it's spelled out in our case law how you have to prove it. But then the municipality decides to give the whole thing to a private employer. And they don't have investigations. They don't discipline. The coroner said it's a homicide. They do nothing. So why would we give them the Monel shield? I disagree with all of that. I know you do. But why, if that were true, why would we give private companies the Monel shield? What's the argument against what the Posner's panel said in Shields? Then you go back to the public policy about public fisc. All right? One of the things that happens is the prices adjust. Do you want to start with a text before you get to policy? I'm sorry, sir. I couldn't hear you. Do you want to start with a text? 1983, the text of the statute. Why not start with a text rather than talk about policy? Yeah. The text is, for 1983, is an action of color of law that violates someone's rights. Sure. And the way that the Monel has been set up is that you do that on a municipality level. And now you're going to move what's been uniform forever, I say forever since the 1980s, to a different analysis. And so all of the corporate cases, the municipality cases, are now no longer going to be applicable to these companies out there doing things. And it's not just going to be prisons. It will be other things. But prisons are certainly the focus here. So you have a known analysis on how cases are decided for political subdivisions and corporations for now as far as the deliberate indifference, the policies, the training, et cetera. That's all going to dissolve if you go down the path that we're speaking of here. The corporations are essentially going to be vicariously responsible for criminal acts. They're going to be vicariously responsible for all these other things, which will then transfer the burden back. Okay, but that's sort of back to policy. Do you have any thoughts or sources? In the Shields decision, they point to a very well-researched article by Frankel in Chicago Law School. So can you tell me why it wasn't the backdrop in 1871 that corporations would be responsible for the torts of employees? Why would we disregard that originalist backdrop? Or do you say it's not? I put in the brief about the policy. I put in the brief about the reasons for the rules and how it applies uniformly, et cetera. The statute in 1871 tort law has now become preeminent, is what we're getting to. And according to the analysis out of the Seventh Circuit, that's what they say. The corporations would not have benefited. And what I'm saying is the Fifth Circuit's never adopted that. They have a uniform application that's already in place. It's being applied to cases right now. Yesterday, last month. Of course, next week it may be different. Okay. You have very little time. I don't mean to move you off it, but I guess let's get to causation. Yeah, and there's two avenues of causation, the four-way and the activities of the COs. There was no doctor looking at what the COs did or didn't do that said anything, any of the actions. They were shown the video. Two of them were hired by the plaintiffs to look at the video and or look at the records and give us opinions on causation. They couldn't do it. Not one doctor saw it. Dr. Nelson said within five hours. Well, but he also said a lot of other things. I know, but as long as he said that, that's a disputed issue of fact. All right, so let's look at it. I don't think it's material in that the other things that were going on that they alleged happened were within the five hours as well. The arrest was within five hours? No, no, no. If you look at the plaintiffs. You mean his fighting with Wood? The Moore fight was at 5 o'clock, between 5 and 6. That's Moore fighting with Wood. The Moore-White fight was between 5 and 6. Okay. Entry was made at 6.08. That was the shove, blow, however you want to describe it with the video shows on runner. Well, do you dispute that it's a blow to the back of his head that knocks him to the ground? No, it's not. Look at the video. Oh, I did look at the video. It knocks him flat to the ground. No doctor said that caused or contributed to his problems. Not one. The traditional analysis of a doctor in a car wreck, gunshot, is that did the accident cause the injury? Nobody said any of the things we've seen on the video caused the bleed. All we have is a timeline. That's not the same thing as causation. We also know that he alleged, the plaintiffs alleged in their pleadings. The coroner did say it was a homicide. Then the doctor said it was a subdural hematoma. The video shows that his head is hit to the ground first. And then the second incident, it sure looks like he's concussed. His head bounces off the floor. So I suppose what you're saying to me is no doctor purported to say it was Runner versus the second guy. Or whatever may have happened. What is the whatever? Is it the arrest? There was an altercation, according to their pleadings, between White and Moore. It would have been between 5 and 6. Then the entry by a… Isn't this the grist of a jury? Who and when was he killed? By whom? If you look at the doctors, not one doctor reaches the decision or even guesses. No one says that a combination of these three. No one says it's all possible, it's all possible. So you're going to be asking the jury to say, well, the doctors couldn't identify this blow. But I think it is.  No, Simpson's different. Guards are trying to extract an inmate from the cell. Guards are extracting an inmate from the cell. Multiple guards. And blows occur to the head. That's Simpson. Everything's on video. There was no 10 guards doing anything to anybody. The doctors looked at… Two of the doctors looked at the video and said that blow did not cause it. It's possible. Another doctor said that fall. It's possible. So none of the doctors gave the traditional opinion that doctors give. More likely than not, X caused the injury. None of those did that. And so now he's come up with a timeline. Something had to happen in there. But we don't know what else may have happened. We do know there were allegations that he was dropped by the OPSO deputies. Well, that claim is now he's trying to get rid of it. But I want to ask another question. Sure. If you could get to the four-way corridor, your argument as to disregarding that, that there's no disputed issue of fact that he was finished, as Foster said he was, is that it depends on Foster's statement not being competent, correct? In other words, your argument. Evidence as to the other defendants, correct. That Foster, all it can be as to the other defendants is a statement that may or may not become admissible. The statement itself is not evidence of anything relative to the other deputies, but if it's a bunch of conspirators saying we're going to finish them off where there are no cameras, how is it not admissible against them? Nobody said that. Foster was allegedly telling the new guy, Badger, about that. That's not evidence of what the other defendants may or may not have done. It's not admissible as to them. We've given the analysis. Give me the site as to where you argued below that it was inadmissible evidence against them. When did you argue that? Judge, if you'll bear with me, there's a Fifth Circuit case that's— No, I'm asking for your record site. Where you argued below that there is no— Right. Okay, so you didn't argue that it was inadmissible. But there is a site, Your Honor, if you'll bear with me. Are you admitting that there is no site? You're admitting that this point is forfeited? I'm sorry. Evidence—I'm sorry. Evidence—say it again, Judge, make sure I got it. I'm asking you for a record site for the proposition that you just asserted to us. Right. That his statement, Foster's statement about finishing off Moore where there were no cameras, was inadmissible against the guards, these defendants. I did not say it in that fashion. There is a case, Judge, that I found— Not a case. I understand. I agree with you, Judge. It's not there. There is a case— Counsel, unless my colleagues have further questions, I'll let you go quite a bit further. If you put the case in, I'm assuming it's in your brief. If you want to just give us the citation, go ahead. If it's in your brief, that's fine. It's not. It's in response to the reply. Well, then give me the citation. And we will not be adding time for this extra time. I apologize, Judge. I had it right here. Well, you've got another—there's another counsel getting up with quite a bit of time. Yeah. Sanchez. I'm sorry. I'm sorry to interrupt. That's fine. The Sanchez case that was held with qualified immunity does not apply to nurses. I'm sorry. It's not Sanchez. No. Why don't you just hand the citation up while he's arguing? I'll take a deep breath, and I'll take care of that, Judge. Thank you. Mr. Kriegbaum for the City of Monroe. Good afternoon, Your Honors, and may it please the Court. My name is Brandon Kriegbaum, and I represent the City of Monroe and Tommy Croson. Plaintiffs have not pursued any claims against Croson on appeal, so we humbly ask that his judgment in his favor be affirmed. The only claims against the City on appeal are Monell claims for RCC's allegedly unconstitutional practices that plaintiffs believe can be imputed to the City. This Court should affirm the dismissal of those claims for three primary reasons. First, plaintiffs failed to raise a factual issue concerning the existence or ratification of any unconstitutional practices. Second, plaintiffs failed to establish an inadequate training claim under the single incident exception, and even if they did, inadequate training was not the moving force behind the constitutional violation in this case. And third, even if there were unconstitutional practices or an issue of fact, those practices were not the City's policies such that the City can be liable under Monell. So I'd like to start with the first point. The district court found that there were no unconstitutional policies in this case. Summary judgment was warranted because plaintiffs have not shown the existence or ratification of any unconstitutional policies. Plaintiffs point to two potentially unconstitutional practices in this case, but given my time constraints, I'd like to focus on one. That is, plaintiffs claim that there was an unconstitutional practice of using the four-way to punish inmates. Plaintiffs' evidence that they introduced below and that they rely on in their brief consists of three items. A declaration by a former employee who said she learned of a practice but was not employed at the time of Moore's incident. That's Yolanda Jackson. That's Yolanda Jackson, yes, Your Honor. A 2016 event where some inmates were pepper-sprayed in the four-way and two guards later pled guilty, and a statement by another employee that he used the four-way to talk to inmates from time to time. We believe that evidence is insufficient to raise a factual issue about the existence of an unconstitutional practice. First, we believe that Jackson's declaration is based on hearsay, and even if you don't agree with that, it is conclusory. Jackson's declaration is hearsay. She was not employed at the time of Moore's incident. She had left her employment prior to the time it occurred, and the only thing she says she knows about this practice is what she, quote, learned from others about the practice. She does not include any details in her declaration that would indicate any personal knowledge that a practice existed, such as, I saw the aftermath of this, you know, I saw or treated wounded inmates who had been subjected to this practice. She just said, I heard from other people that this practice exists. We believe that that is hearsay, Your Honors. But even if you don't believe that it's hearsay, it's conclusory. So to prove a practice under this Court's precedence, there are a lot of factors that this Court's looked to. They looked to the type of force that was used, the severity, how often it occurred, how many times it occurred, who was involved, how long the practice existed. None of those details are in Yolanda Jackson's declaration. Remind me, what was the district court's – did the district court find that it was hearsay, conclusory, or both? The district court said – I think it was one sentence in the district court's ruling on this issue where the district court said Yolanda Jackson had no personal knowledge of the event that occurred with Erie Moore, and that's not sufficient to establish it in this case. And so plaintiffs take issue with that finding. We're going further than the district court actually went and saying there's additional reasons that this declaration doesn't get the job done. So again, the declaration by Jackson gives you none of the details. Essentially, plaintiffs want to skip all the evidentiary burdens they have to prove a practice and say, somebody said she heard a practice existed, so we get to claim as fact that a practice existed. I don't think that's sufficient to prove a practice under this Court's precedence. Even considered alongside the other evidence, the evidence that there were the guards that were – who later pled guilty, again, that best proves one other incident of a use of force that occurred after this. Those individuals in a civil suit might have a better practice case, but there's nothing predating this in Yolanda Jackson's declaration, even considered with that. I also want to mention the statement by Antonio Turner. He said he did talk to inmates in the four-way from time to time. He categorically denied it was a practice and said he had – I think he was interrupted, but was getting to the point that he had no knowledge of whether other people used it for that purpose. So that's not the kind of consistent statements in the cases they cite, too, like Montano and Cook County out of the Seventh Circuit, where you had people who were involved with the practice actually telling you the details that occurred. I'd like to turn to – if there are no further questions on that, I'd like to turn to the next argument, which is ratification and then training. We do not believe that ratification applies in this case. We think this Court's precedence, and then the Supreme Court's going back to Paprotnik, that there's got to be a knowing approval of the conduct. I think plaintiffs, in brief, kind of get to the crux of this issue. They say this beating in the four-way was concealed from everyone. It only came to light several years later through a spontaneous confession. I don't think that the warden could have knowingly approved of a practice that was actively concealed from him and others. Going to the training point, under this Court's precedence, again, under the single incident exception which they invoke in this case, which plaintiffs invoke in this case, I apologize, under that exception, there's got to be no training whatsoever. And I think if you look at this Court's cases like Cazo, Panetta, Pena, Peterson, when there's academy training, when there's just bare training on the constitutional duty, even in early stages of someone's career, that defeats a claim that there was no training whatsoever. I think this is distinguishable from cases that the plaintiffs rely on, like Bryan County and Brown, or Bryan County versus Brown, where that officer, they just stuck an officer on the street who had absolutely no training, had never been to the academy. In Little, another case that's cited, in that case, they allowed teachers to strip search students and never told them that the Fourth Amendment existed or how to conduct a strip search. And so those are the kinds of cases where the single incident exception applies. That is not this case. Finally, with my short time left, I'd like to turn to the delegation issue. And I think our point on that is very straightforward. The city contracted with Richwood for the safe housing, custody, and care of its inmates. Its contract with Richwood expressly said you must adhere to these existing state standards, which are the basic jail guidelines. When your client did contract out, so privatized the prison, have you had a chance to look at shields and think about whether your shield, your Monell shield, should apply to these private employers you've given responsibility to? I haven't analyzed it. I'll admit I have not analyzed it from that perspective. Do you have thoughts or do you prefer not to comment on it? I prefer not to comment, I guess, on that particular question. But I do think that even in cases where there have been any issues in the medical contractor context, the Monell claim against the city has always been analyzed separately. And I don't think plaintiffs are pressing the claim. I think when my friend Mr. Flynn got up, he said we're limiting this to the private contractor when he talked about responding at Superior Court. So even if that is the case, I don't think that's at issue in this case. And so we'd just ask—I see my timer's run out. So if there are no further questions, we just ask that the district court be affirmed in this case. Before we hear rebuttal, Mr. Calvin, any luck on this case? It was in my brief, Your Honor. Oh, it is in the brief. Yeah, okay. It's a Ballard case. Okay. It says— Just the name of the case is what? Yes, sir. It's Ballard, B-L-L-A-R-D. Oh, sure. Okay. That was cited for the hearsay proposition. Yes, sir. Okay. Thank you. Mr. Flynn, you've got a chunk of time. I'm going to go ahead and ask a question on the private company for Monell issue. You're obviously not here telling us that Monell is wrong. No. Right. So the question, I guess, is you're trying to distinguish Monell. I'm trying to figure out what the principal distinction is, because if I understand—if I'm reading Monell correctly, it turns on analysis of the word cause, not on a word like person. Yes, sir. I'm not really sure how we can distinguish Monell in the way that you want us to, vis-à-vis what kinds of parties are the persons subject to 1983 liability. Do you follow what I'm saying? Yes, Your Honor. So the Supreme Court explained that the word cause there incorporates causation law from the common law, as it stood in 1871, and that there were immunities that applied to municipalities at that time that apply to municipalities today by virtue of that incorporation into Section 1983. There were no such immunities at common law for private corporations. And so that's the distinction, is the common law distinguished between these actors, and so therefore Section 1983 does as well. I heard Your Honors ask for some argument based on the text and the common law something like four times, and respectively I heard no answer from the other side. They say that this is new liability, but actually it's ancient liability. In our opening brief at pages 76 to 77, we cite the cases where there were no immunities like this for private actors, in particular private prison contractors, who were liable for tort claims. That argument on your behalf would work if it was a historical point, but I guess what I'm wondering is isn't the Supreme Court telling us that the word cause just textually forecloses the notion of being liable for somebody else? In other words, you have to be the one causing or subjecting or causing to subject somebody else to a problem. That sounds more like your own action as opposed to the action of an agent. Tell me why I'm wrong. Yes, Your Honor, and it was a combination of that textual reading and the understanding that that text is meant to incorporate the common law. So that's city of Newport, it's city of Oklahoma City, where the Supreme Court has said that it was incorporating immunities that existed for municipalities, but not for private actors here. Well, so under that view, though, if Monell is rationed based on both text and history, I take your point that then you win on history, but don't you then lose on text? I don't think so, Your Honor, because I think it is the history acting through the text, as the Supreme Court explained, that that text is what is incorporating the historical common law. And so I think, again, we're applying the text, we're applying the common law, because the text is calling upon the common law. I also heard no effort to distinguish Shields on the merit, on its merits, and I'd note also that, you know, we have argued and briefed Monell liability, which is available as an alternative here. There's no dispute that corporations can be liable that way through Section 1983. Of course, if this Court determines that responding against pure liability applies, it need not reach the Monell issues. On causation, I think the defendants are asking for a kind of medical precision that doesn't exist. And as courts have explained, juries are allowed to use common sense. So a juror could look at the video, it could hear testimony about what occurred, and then it could hear testimony from the coroner that, quote, that it was a homicide from head injuries received while in jail. Again, testimony from the coroner that, quote, it was consistent with coming into contact with a hard floor. That's 23258 and 24937. And then they'd hear from a testifying treating physician, Dr. Nelson, who described this injury as requiring, quote, significant force, and, quote, something like being body slammed head first into a hard floor, 24182. That's Dr. Nelson. And so I think either what the defendants are asking for, we have, or a jury could fill in the gaps using common sense. And that's this Louisiana Supreme Court case, Lascia v. Olincorp, which describes juries using their common knowledge and observing the circumstantial evidence. Before your time runs out, do you agree with Mr. Calvert as to the, what are the live claims and defendants? I do, Your Honor. You do. And also as to Croson? Excuse me? As to the Croson. Oh, yes. Yes, Your Honor. And then I just note that Bellard supports our argument. I refer the court to the text of Bellard. They use Bellard to say that it's a problem, that there wouldn't be testimony at trial. But we offered this evidence at summary judgment. The district court considered it. They neglected to raise a hearsay argument below. They now concede that there was no argument below. Bellard, was that a party opponent admission? Yes. Well, what about Jackson, though? Jackson does sound like they did preserve it. They did not, Your Honor. Well, personal knowledge is sort of the flip side of hearsay, isn't it? Flip side. I mean, the district court didn't have the opportunity to analyze the hearsay exceptions because there was no hearsay argument below. And I'd also analogize between Jackson and Foster. The guards who spoke to Jackson certainly had personal knowledge of the practices, and they were employees of LaSalle and Richwood. So even if you're not persuaded. I did stop him. Yes, Your Honor. I probably should, too. Thank you very much. Wonderful. Thank you. The case is submitted. I appreciate all the argument. We'll call the second and last case.